# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY SAPKO, *et al.*,                  )
                                        )
                 Plaintiffs,            )      Civil Action No. 06-893
                                        )
         v.                             )      Judge Cercone
                                        )      Magistrate Judge Caiazza
RINGGOLD AREA SCHOOL                     )
DISTRICT, *et al.*,                     )
                                        )
                 Defendants.            )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

Nancy Sapko ("Sapko") and Kathleen M. Pitzer ("Pitzer") (collectively "the Plaintiffs") allege that their employer, Ringgold Area School District ("Ringgold" or "the District") and Dwyane Homa ("Homa") (collectively "the Defendants"), acting as an individual in his capacity as Ringgold High School Principal, discriminated against them in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Sapko and Pitzer also allege discrimination on the basis of sex by creating a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. The Plaintiffs make similar claims under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 et seq. Following the completion of discovery, the Defendants filed a Motion for Summary Judgment. (Doc. 26). It is respectfully recommended that the Defendants' Motion be granted in part and

denied in part.

## II. **BACKGROUND**

This case centers around the 2005-06 academic year at Ringgold High School. More specifically, the dispute concerns the teaching schedules developed for the mathematics department that year. (Doc. 28 at p. 1). As High School Principal, Defendant Homa played a significant role in setting the schedules. (<u>Id.</u>; Doc. 26-4 at pp. 7-8).

Homa began his tenure at Ringgold at the beginning of the 2004-05 academic year. (Doc. 26-4 at p. 7). His involvement in setting the teaching schedules began with the schedules to be established for the 2005-06 academic school year. (<u>Id.</u> at p. 17; Doc. 28 at p. 3). Prior to the finalization of the schedules, Homa, along with Assistant Principal Jeffery Matty ("Matty"), met with groups of teachers, based on their departments, to discuss the philosophy driving the development of the schedules. (Doc. 26-4 at p. 13; Doc. 28 at p. 3; Doc. 26-10 at p. 11).

On more than one occasion, Homa stated he believed that the younger teachers, or teachers who had recently graduated from school, are "more or better qualified" than their older counterparts. (Doc. 26-4 at p. 22). Attempting to clarify his comments, Homa stated, "teachers who have just recently graduated from college are - are, yeah, more qualified, better qualified." (<u>Id.</u> at pp. 22-23). When asked to characterize "senior people,"

Homa responded, "looking at the range of when people start and when they retire, it would probably be someone that you think would be on the tail end of - are at least twenty years experience, because I believe they had eighteen years in their profession, so they would be a senior person." (Id. at p. 28).

The District's curriculum included Calculus and Advanced Placement (AP) Calculus. (Doc. 26-10 at pp. 13-15). These are separate courses, and have historically been viewed as requiring distinct, separate preparations. (Id.). The relevant collective bargaining agreement restricted Ringgold from providing any teacher with a course load that would involve more than three preparations. (Id.).

Pitzer began her employment with the Ringgold School District in 1997 as a mathematics teacher assigned to the High School Building. (Doc. 26-7 at pp. 3-4). During her tenure in the District, and prior to the 2005-06 school year, Pitzer had not taught a Calculus or AP Calculus course. (Id. at p. 4). Rather, all of the calculus classes had been assigned to another member of the mathematics department, Arlene Kranjnik. (Id. at p. 5). When Ms. Kranjnik announced her intent to retire at the end of the 2005-06 school year, Pitzer began to express interest in teaching the calculus classes the following year. (Id. at pp. 5-6).

To that end, Pitzer spoke with Homa in order to obtain a

-3-

letter of recommendation so that she might participate in a
University of Pittsburgh program intended to prepare her to teach
the classes. (Id.; Doc. 26-4 at p. 18). In mid-May of 2005,
Pitzer began participating in the first segment of the
University's program. (Doc. 26-7 at p. 5).

Several days later, following the 2005 Ringgold Prom, Matty
spoke with Pitzer concerning potential adjustments to the
teaching schedule for the following year. (Doc. 26-10 at pp. 10-
11). There is some debate over the nature of this discussion and
what, if anything, Pitzer was promised in the way of teaching
assignments. (See Doc. 30 at pp. 4-5; Doc. 28 at pp. 5-6). In any
event, on May 16, 2005 - the following week- Matty informed
Pitzer that she would not be teaching all of the calculus
classes, that she might be scheduled for only one calculus class,
and that she might also be assigned to teach Math Strategies and
Algebra classes. (Doc. 26-10 at p. 12; Doc. 26-7 at p. 6). As a
direct result of this change in teaching assignments, Pitzer
resigned from the University of Pittsburgh program. (Doc. 26-4 at
pp. 17-18). Subsequently, and consistent with the certification
provided by the University of Pittsburgh, Beth Horchak was
assigned to teach AP Calculus, without having to complete any
additional course work because of her qualifications. (Id. at p.
18).

Beginning with the 1992-93 academic year, Sapko was employed

by the Ringgold School District as a full-time mathematics teacher, in a permanent position. (Doc. 26-8 at pp. 11-12). She remained in this position until her resignation in July of 2005. (Id.). Throughout this period, she was assigned to the High School to teach various mathematics courses, namely Algebra and Essentials of Mathematics. (Id.). Her reasons for accepting the assignment are in dispute; it is clear, however, that prior to the commencement of the 2005-06 school term, Sapko exercised her right to voluntarily resign for retirement purposes, and to avail herself of the Early Retirement Incentive. (Id. at pp. 56-60).

On July 7, 2006, Sapko and Pitzer filed this action alleging violations of the ADEA, Title VII, and the PHRA. (Doc. 1). The Defendants' Motion for Summary Judgment (Doc. 26) is pending.

### III. **STANDARD OF REVIEW**

Summary judgment is appropriate only where the pleadings, depositions, answers to interrogatories, and admissions on file demonstrate that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The mere existence of some evidence favoring the non-moving party will not defeat the motion. There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party.

Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

In response to a motion for summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." Celotex, 477 U.S. at 324. "Speculation and conclusory allegations do not satisfy this duty." Ridgewood Bd. of Educ. v. N.E. ex rel. M.F., 172 F.3d 238, 252 (3d Cir. 1999). A motion for summary judgment will be granted when the materials in the record, if reduced to admissible evidence, would be insufficient to satisfy the non-moving party's burden. Celotex, 477 U.S. at 322.

With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether th employer intentionally discriminated against the plaintiff." Kellerman v. UPMC St. Margaret, 2008 U.S. Dist. LEXIS 10064, *16-17 (W.D.Pa. 2008) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)). The task of the court is not to second-guess employment decisions, but instead to determine whether the employment decisions were motivated by an illegal discriminatory or retaliatory purpose. Ezold v. Wolf, Block, Schorr &Solis-Cohen, 983 F.2d 509, 525 (3d Cir. 1992).

## IV. **ANALYSIS**

### 1. **Prima Facie Case Under the ADEA**

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In cases arising under the ADEA, courts apply the familiar three-part burden-shifting analysis set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). This analysis was originally developed for employment discrimination cases arising under Title VII. *See* <u>Robinson v. Lockhead Martin Corp.</u>, 212 Fed. Appx. 121, 123 (3d Cir. 2007).[1]

Under this frame work, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *See*

---

[1]

> "[I]n the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose - to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well. Courts routinely use Title VII and ADEA case law interchangeably when there is no material difference in the question being addressed."

<u>Newman v. GHS Osteopathic, Inc.</u>, 60 F.3d 153, 157 (3d Cir. 1995). The same is true for the PHRA. "[A]nalysis of an ADA claim applies equally to a PHRA claim." <u>Williams v. Philadelphia Housing Auth. Polic Dept.</u>, 380 F.3d 751, 761 n.6 (3d Cir. 2004)(quoting <u>Taylor v. Phoenxville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999)).

McDonnell Douglas, 411 U.S. at 802. If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer/defendant to "articulate some legitimate non-discriminatory reason for the employee's rejection." Id. Finally, should the defendant carry this burden, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. James v. Sch. Dist., 198 F.3d 403, 410 (3d Cir. 1999)(citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).

To make out a *prima facie* case under the ADEA, the plaintiff must show that: (1) she was a member of a protected class (namely, that she was over 40 years old); (2) she was qualified for the position in question; (3) she suffered from an adverse employment decision; and, (4) she was ultimately replaced or treated differently than an employee who was not within the protected class so as to permit a reasonable inference of discrimination. Kenney v. Footlocker Worldwide, 55 Fed. Appx. 35, 36 (3d Cir. 2002)(citing Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 65-66 (3d Cir. 1996)).

A review of the federal employment discrimination law reveals that disparate treatment suits may be divided into three classes: pure discrimination, pretext, and mixed-motive cases. Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 n.4 (3d

-8-

Cir. 1995).[2] Although the Plaintiffs never explicitly cite to the precise class serving as the basis of this action, it is clear from the record that they are proceeding under a mixed-motives theory. In <u>Price Waterhouse v. Hopkins</u>, 480 U.S. 228 (1989), the Supreme Court borrowed the mixed-motive standard originally applied in a constitutional tort case, and adapted it for cases arising under Title VII and -by extension- to the ADEA. *See* <u>id.</u> at 248-50. A mixed-motive case is one in which both legitimate and illegitimate factors contribute to the employment decision. <u>Id.</u> at 232 (plurality). Such a case differs from a pretext case in that the plaintiff must present evidence of illegal discrimination "sufficiently strong to shift the burden of proof to the employer," - meaning that the plaintiff must adduce "direct evidence" of discrimination. That burden requires more persuasive evidence than is required by the <u>McDonnell Douglas</u>/<u>Burdine</u> *prima facie* standard. <u>Id.</u> at 277-78 (O'Connor, J., concurring); <u>Armbruster v. Unisys Corp.</u>, 32 F.3d 768, 777-79 (3d Cir. 1994); <u>Starceski</u>, 54 F.3d at 1096.

To rebut a plaintiff's case-in-chief in a mixed-motives case (that is, once the plaintiff has met her burden of proving an illegitimate factor "played a motivating [or substantial] part in the employment decision"), the employer must prove that "it would

---

[2] For purposes of this case, we need not address the disparate impact theory of employer liability.

have made the same decision even if it had not allowed [the illegitimate factor] to play such a role." Price Waterhouse, 490 U.S. 244-45 (plurality). The employer's rebuttal is thus an affirmative defense. *See* id. at 246.

In Glanzman v. Metropolitan Mgmt. Corp., 391 F.3d 506 (3d Cir. 2004), the Third Circuit Court defined the required effect of "direct evidence":

> To be "direct" for purposes of the Price Waterhouse test, evidence must be sufficient to allow a jury to find that the decision-makers placed substantial negative reliance on the plaintiff's age in reaching their decision.

Id. at 512 (citing Fakete v. Aetna, 308 F.3d 335, 338 (3d Cir. 2002)). The Court also stated that "[not] all evidence that is probative of illegitimate motives . . . is sufficient to constitute direct evidence of discrimination." Id. Next, the Court turned to the facts of the case:

> We are troubled by the district court's determination that [Defendant's] remark does not, in and of itself, reflect that the reason for [Plaintiff's] termination was to replace her with a younger woman. To be sure, [Defendant's] statement does not support a compellable inference that ageism was the cause of the decision to terminate [Plaintiff's] employment. Such a statement, however, is fraught with permissible inferences that he desired to fire [Plaintiff] at least in part because of her age. One could reasonably determine that [Defendant's] statement that he would replace [Plaintiff] with a younger woman is, in effect, an admission that at least part of the actual reason for the employment decision was a

-10-

> desire to hire someone younger and more
> endowed... A rational jury could find that
> [the Defendant Company] placed a substantial
> negative reliance on [Plaintiff's] age in
> making the decision to terminate her
> employment. Accordingly, we conclude that
> [Plaintiff] met her burden and presented
> direct evidence.

Glanzman, 391 F.3d at 514 (internal citations omitted). Thus,
the Third Circuit Court has made it clear that summary judgment
is defeated when a plaintiff presents direct evidence from a
decision-maker which would allow a jury to infer that the
employer placed a "substantial negative reliance" on age in
making an employment decision.[3]

Under the Price Waterhouse mixed-motive theory of
discrimination, once direct evidence of discrimination is
presented, "the burden of persuasion on the issue of causation
shifts," and the employer must prove that it would have taken the
action even if it had not considered the plaintiff's age. Id. at
512 (quoting Price Waterhouse, 490 U.S. at 265-66). Stated
differently, direct evidence is sufficient when "if believed,

---

[3] While Defendants' brief in support of this motion is not a
model of clarity, it seems to suggest that, citing Starceski, in order
for Plaintiffs to satisfy their burden, they are required to produce
some type of "statistical evidence." (See Doc. 27 at pp. 5-7). We
disagree. Concerning a mixed-motives analysis, the court stated:
"[If] plaintiff's non-statistical evidence is directly tied to the
forbidden animus, for example policy documents or statements of a
person involved in the decision-making process that reflect a
discriminatory animus of the type complained of in the suit, that
plaintiff is entitled to a burden-shifting instruction." Starceski, 54
F.2d at 1097 (quoting Ostrowski v. Atlantic Ins. Co., 968 F.2d 171,
182 (2d Cir. 1992)).

would prove the existence of the fact in issue without the inference of presumption." <u>Read v. Stone and Webster Engineering Corp.</u>, 6 F. Supp.2d 398, 401 (E.D.Pa. 1999). Moreover, in <u>Starceski</u>, the court stated that ". . . direct evidence of discriminatory animus leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it. As Chief Justice Vinson put it... 'he who has a mind to discriminate is likely to do so.'" <u>Starceski</u>, 54 F.3d at 1097 (internal citations omitted).

For purposes of this Motion, it is undisputed that the Plaintiffs have satisfied the first three elements of their ADEA claim. After reviewing the record, the court concludes that they have also succeeded in satisfying the fourth element of their claim.

First, Homa on numerous occasions admitted that he believed younger teachers to be better or more qualified than their older counterparts. (*See* Doc. 26-4 at pp. 22, 23, 28). These admissions, made my the Defendant during his deposition, rise to the level of direct evidence for purposes of the <u>Price Waterhouse</u> test. In addition to these statements, Homa also stated that he was in favor of a "younger faculty" and that he believed that "anyone over 50 should retire." (Doc. 26-7 at p. 10).[4]  Homa

_____

[4] Although these statements were relayed to Plaintiff Pitzer by Ms. Debbie Massa and Ms. Leona Cole, they are properly considered by the court at the summary judgment stage. Hearsay statements which are

-12-

attempted to lessen the effect of his remarks by referring to "new graduates" as opposed to "younger teachers." (Doc. 26-4 at p. 22). However, in his deposition, Homa concedes that the vast majority of recent college graduates are in their early to mid-twenties. (Id.). As the Third Circuit Court has recognized, a similar ageist statement about new graduates was "fraught with permissible inferences" with respect to bias based upon age. Glanzman, 391 F.3d at 506. In this case, as in Glanzman, "one could reasonably determine" that Homa's statements were an admission that "at least part of the actual reason for the employment decision" was based upon age. Id. Parenthetically, Homa is the lone "decision-maker" assigned to the task of scheduling calculus classes. The evidence in this record is sufficient to defeat the Defendants's Motion for Summary Judgment.

## 2. **Prima Facie Case Under Title VII**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42

---

capable of being reduced to admissible evidence at trial are permissibly considered in deciding a motion for summary judgment. Celotex, 477 U.S. at 324.

U.S.C. § 2000e-2(a)(1).[5]  To defeat Defendants' Motion for

Summary Judgment,[6] the Plaintiffs must establish a *prima facie*

case of discrimination. Such an analysis must take place within

the paradigm of a claim for a hostile work environment.

Generally, to prove a hostile work environment, a plaintiff must

show that: (1) she suffered from intentional discrimination

because of her sex; (2) the discrimination was severe or

pervasive;[7] (3) the discrimination detrimentally affected her;

(4) the discrimination would detrimentally affect a reasonable

person of the same sex in that position; and, (5) the existence

of *respondeat superior* liability. <u>Andrews v. City of

Philadelphia</u>, 895 F.2d 1469, 1478 (3d Cir. 1990); <u>Jensen v.

Potter</u>, 435 F.3d 444, 449 (3d Cir. 2006).  A plaintiff's ability

fo proffer evidence sufficient to meet each element of a hostile

work environment claim generally precludes summary judgment.

---

[5] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See* <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 104 (3d Cir. 1996). Therefore, the disposition in Plaintiff's Title VII claim applies with equal force to their PHRA claim.

[6] Like claims arising under the ADEA, claims made under Title VII are subject to the burden-shifting analysis articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

[7] While the <u>Andrews</u> Court stated that the discrimination in question must have been "pervasive and regular," the United States Supreme Court has employed a "severe and pervasive" standard. *See* <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270 (2002), which the Third Circuit Court recently adopted, noting that "[t]he difference is meaningful, and the Supreme Court's word controls." <u>Jensen</u>, 435 F.3d at 449 n.3, *overruled in part on other grounds by* <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006).

-14-

<u>Abramson v. William Paterson College of New Jersey</u>, 260 F.3d 265, 280-81 (3d Cir. 2001).

Within this framework, it is not enough to show mere annoyance or discomfort. A plaintiff must show that the harassing behavior was "sufficiently severe or pervasive to alter the conditions of [her] employment." <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)(internal quotation marks omitted); <i>see also</i> <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 22 (1993)("[T]he very fact that the discriminatory conduct was so server or pervasive that it crated a work environment abusive to employees. . .offends Title VII's broad rule of workplace equality."). In determining whether an environment is sufficiently hostile or abusive, courts must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening of humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998). The conduct "must be extreme to amount to a change in the terms and conditions of employment." <u>Id.</u>

Here, the Plaintiffs contend that they were subject to a hostile work environment as a result of the Defendants' sexual favoritism. The parties, however, dispute whether such a claim is cognizable under Title VII. For instruction, we turn to the

Equal Employment Opportunity Commission's ("EEOC") guidelines, as well as interpreting case law. *See* Meritor Savings Bank, 477 U.S. at 65; Drinkwater v. Union Carbide Corp., 904 F.2d 853, 859 n.10 (3d Cir. 1990)("EEOC guidelines are accorded deference in sexual harassment discrimination cases."). The EEOC has issued guidelines specifically related to this legal theory. *See* EEOC POLICY GUIDANCE ON EMPLOYER LIABILITY UNDER TITLE VII FOR SEXUAL FAVORITISM, EEOC NOTICE NO. 915-048 (Jan. 12, 1990). The EEOC's Policy Guidance clearly states that sexual favoritism can be the basis for a valid hostile work environment claim under Title VII: "If favoritism based upon the granting of sexual favors is widespread in a workplace, both male and female colleagues who do not welcome this conduct can establish a hostile work environment in violation of Title VII regardless of whether any objectionable conduct is directed at them." Id.[8]

Although this cause of action is recognized, Title VII does not protect against all types of sexual favoritism. *See* EEOC NOTICE NO. 915-048, *supra*. There are no grounds for such a claim

---

[8] This concept has been codified in the Federal Code as well as recognized in our jurisprudence. *See, e.g.,* 29 C.F.R. § 1604.11(g)(1993)("Where employment opportunities or benefits are granted because of an individual's submission to the employer's sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who were qualified for but denied that employment opportunity or benefit."; Drinkwater, 904 F.2d at 861 n.15 ("The theoretical basis for the kind of environmental claim alleged here is that the sexual relationship impresses the workplace with such a cast that the plaintiff is made to feel that she is judged only by her sexuality.").

"[w]hen an employer discriminates in favor of a paramour, [as] such an action is not sex-based discrimination, [because] the favoritism, while unfair, disadvantages the sexes alike for reasons other than gender. . ." <u>Rosa v. Seiko Corp.</u>, 2008 U.S. Dist. LEXIS 5530 (D.N.J. 2008)(quoting <u>Wilson v. Delta State Univ.</u>, 143 Fed. Appx. 611, 614 (5th Cir. 2005)); *see also*, <u>Drinkwater</u>, 904 F.2d at 862 ("A sexual relationship between a supervisor and a co-employee could adversely affect the workplace without creating a hostile work environment. A supervisor could show favoritism that. . . would not necessarily instill the workplace with oppressive sexual accentuation. The boss could treat everyone but his. . . paramour badly. . ."). In other words, it is not enough merely to show that the supervisor was engaged in a sexual relationship with a co-worker.

Here, the Plaintiffs' allegations against the Defendants cannot survive because they have failed to demonstrate that inappropriate relationships were prevalent at Ringgold High School. In fact, they have not shown that *any* relationships of a romantic nature existed at the school. Their claims rest on circumstantial evidence and inferences. For example, Pitzer testified that she believed the Mathematics Department at Ringgold had a hostile environment because certain individuals, namely, the two younger female teachers, Beth Horchak ("Horchak") and Megan Pankiewicz ("Pankiewicz"), along with Assistant

Principal Matty, and the head of security, Mr. Ottie Caruso ("Caruso"), "had a very social clique" during the 2004-05 academic school year. (Doc. 26-7 at p. 11). When asked what she meant by "social clique," Pitzer testified that these individuals had lunch together at least three times a week (Id.); that they discussed personal matters in the faculty lunchroom (Id.); and that they had meetings in Defendant Homa's office. (Id.). It is from these several instances of socializing that Pitzer's claim of a hostile work environment arises. (Id. at p. 12).

Next, the Plaintiffs' claims are based upon rumors and accusations made by other faculty and staff members, the most significant of which involves the May 2005 Ringgold Prom. Although Pitzer did not attend the Prom (Id. at p. 7), it was reported to her by Lynda Robinson ("Robinson"), another teacher in the mathematics department, that improper activities took place that night between Homa, Matty, Caruso, Horchak and Pankiewicz. (Id.). Robinson attended the Prom and told Pitzer that "things happened at the Prom," but did not elaborate further. (Id.).

Similarly, Sapko did not attend the 2005 Prom, but also heard from Robinson about improper occurrences at the prom. Specifically, Robinson told Sapko that Homa, Matty, Horchak and Pankiewicz used the hospitality rooms, excluding other chaperones. (Doc. 26-8 at pp. 13-14). Robinson did not, however,

report to Sapko that anything inappropriate had occurred among those individuals. (Id.). Several weeks later, Robinson told Sapko that "inappropriate behaviors influenced things going on within our school building" (Id. at p. 15), but again failed to elaborate. (Id. at pp. 16-17). In fact, Sapko said she "honestly did not know whether the behavior to which Mrs. Robinson referred was sexual in nature." (Id. at p. 17). Finally, Sapko, like Pitzer, admitted to having no direct knowledge of any improper behavior between Home, Horchak or Pankiewicz – only what she heard by "word of mouth in the building." (Id. at pp. 43-46).

The only basis for a sexual harassment claim is the Plaintiffs' speculative testimony, which is insufficient to overcome a motion for summary judgment. See Shelton v. University of Med. & Dentistry, 223 F.3d 220, 227 (3d Cir. 2000); Solomon v. Soc'y of Auto Eng'rs, 41 Fed. Appx. 585, 586 (3d Cir. 2002). Moreover, the Plaintiffs have not offered any evidence showing that the alleged sexual favoritism affected only women. Both Pitzer and Sapko admit that other teachers were affected, including Robinson and Mr. Bob Hanna. (Doc. 26-7 at p. 8; Doc. 26-8 at p. 62). In sum, there is nothing in the Plaintiffs' claims, besides their own speculation and unsupported conclusions, that would show they were treated less favorably than other employees based on their sex.

Next, Title VII is not "a general civility code for the

-19-

American workplace." <u>Jensen</u>, 435 F.3d at 449 (quoting <u>Oncale v.</u>
<u>Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80-81 (1998)).
"Many may suffer severe or pervasive harassment at work, but if
the reason for the harassment is one that is not proscribed by
Title VII, it follows that Title VII provides no relief." <u>Id.</u>
Ultimately, the burden rests with the plaintiff to prove by a
preponderance of the evidence that a *prima facie* case of
discrimination exists  -the mere possibility of discrimination
will not suffice. <u>Hawthorne v. Mercer County Children & Youth</u>
<u>Services</u>, 2007 U.S. Dist. LEXIS 57150, *28 (W.D.Pa. 2007).
Because the Plaintiffs have not submitted evidence from which a
reasonable fact-finder could conclude that a gender-based animus
motivated Homa's alleged favoritism, their hostile work
environment claims under both Title VII and the PHRA are
insufficient to withstand Defendants' Motion for Summary
Judgment.[9]

### 3. **Individual Liability Under the PHRA**

As an initial matter, the parties do not dispute that
neither Title VII not the ADEA create individual liability for
Defendant Homa. (Doc. 31 at p. 24).[10]  Generally, the PHRA is

---

[9] Given our disposition of Plaintiffs' claims concerning age and
sex-based discrimination, any arguments concerning whether Plaintiffs
can or must prove adverse employment action are rendered irrelevant.

[10] *See* <u>Dici v. Pennsylvania</u>, 91 F.3d 542, 552 (3d Cir. 1996)("[A]n
individual cannot be held liable under Title VII."); *see also*, <u>Cohen</u>

-20-

applied in accordance with Title VII. Dici, 91 F.3d at 552; Davis v. Sheraton Society Hill Hotel, 907 F. Supp. 896. 899 n.1 (E.D.Pa. 1995). Like Title VII, the definition of an employer under the PHRA cannot be construed to include "employees;" rather, "employee" is defined as a wholly separate term under the Act. *See* 43 Pa. Cons. Stat. Ann. § 954(b) and (c). The employment discrimination provision of the PHRA states only that "any employer" may be held liable. Id. at § 955(a).

A different section of the PHRA, however, "contemplates liability that extends beyond that of Title VII." Schepis v. Raylon Corp., 2004 U.S. Dist. LEXIS 17217, *3 (E.D.Pa. 2004)(citing Dici, 91 F.3d at 552). Section 955(e) of the PHRA states:

> It shall be an unlawful discriminatory practice...
> \*       \*       \*
> For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

Id.

---

v. Temple Physicians, Inc., 11 F. Supp.2d 733, 736 (E.D.Pa. 1998)(holding that because Title VII and the ADEA are interpreted consistently, no individual liability exists under the ADEA either); Marian v. City of Philadelphia Water Dept., 161 F. Supp.2d 381, 384, 389 (E.D.Pa. 2001)(same).

The question, then, is whether Homa may be a proper
defendant under this section for aiding and abetting the unlawful
discriminatory practices of the Ringgold School District.[11]
After reviewing the record, the district court should not grant
summary judgment to Homa on the Plaintiffs' PHRA claim. As
Plaintiffs' supervisor, Homa is a proper defendant under § 955(e)
and may be liable for aiding and abetting discriminatory
practices, as Plaintiffs have pleaded facts which, if true, could
impose liability for violations of the PHRA. See Dici, 91 F.3d at
553. The Third Circuit Court has held that where a plaintiff has
provided evidence that a supervisor was aware, or should have
been aware, of illegal or discriminatory actions, and has taken
no steps to prevent or remedy those actions, that supervisor is
subject to the provision of the PHRA, and summary judgment is
inapplicable. See id. Defendant Homa was an active participant
in all of the offending incidents, has made age biased
statements, and has admitted to having an age bias in his
deposition.

## V. CONCLUSION

Because the Plaintiffs have not established a *prima facie*
case of hostile work environment under Title VII, and because

---

[11] Because Homa cannot be held liable under either Title VII or
the ADEA, there exists no independent jurisdictional basis to maintain
a PHRA claim against him in federal court. We, therefore, resolve this
claim pursuant to an exercise of supplemental jurisdiction under 28
U.S.C. § 1367 (1994).

material questions of fact exist with respect to the Plaintiffs'
claims under the ADEA and the PHRA, Defendants' Motion for
Summary Judgment (Doc. 26) should be denied in part and granted
in part as set out in this Report and Recommendation.[12]

In accordance with the Magistrate's Act, 29 U.S.C. §
(b)(1)(B), 636(b)(1)(b) and (c), and rule 72.1.4(b) of the Local
Rules for Magistrates, objections to this Report and
Recommendation are due by May 30 2008.  Responses to objections
are due by June 9, 2008.

May 14, 2008

Francis X. Caiazza
U.S. Magistrate Judge

cc (via email):

Susan T. Roberts, Esq.
Joel S. Sansone, Esq.

---

[12] Plaintiffs consent to the withdrawal of claims for individual
liability against Defendant Homa under Title VII and the ADEA. (Doc.
31 at p. 25 n.29).  Plaintiffs also consent to the withdrawal of a
demand for punitive damages under Title VII and the PHRA. (Id.).  In
any event, remaining issues of damages are not properly reviewed at
this stage.